**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| JOHN A. STUCZYNSKI, | |
| Plaintiff, | No. 21-cv-00059 |
| v. | Judge John F. Kness |
| THE SCOTTS COMPANY LLC, d/b/a SCOTTS MIRACLE GRO, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Stuczynski brings this action against his former employer, Defendant The Scotts Company LLC, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. (Dkt. 29 ¶ 1.) In January 2020, Defendant terminated Plaintiff's employment as a truck driver. (*Id.* ¶ 9.) Plaintiff alleges that he was terminated because he is white and brings claims for employment discrimination (Count I) and a hostile work environment (Count II). (*Id.* ¶¶ 10–16.) Defendant, however, maintains that Plaintiff was terminated for failing to wear a seatbelt in violation of Defendant's safety requirements; Defendant now moves for summary judgment. (Dkt. 43 ¶ 2.) For the reasons that follow, Defendant's motion for summary judgment is granted as to both counts.

## I.  BACKGROUND

Defendant manufactures and sells consumer lawn and garden products. (Dkt. 29 ¶ 6.) In January 2019, Defendant hired Plaintiff as a truck driver to work at Defendant's distribution facility in Bolingbrook, Illinois. (*Id.* ¶ 5; Dkt. 45-1.) Plaintiff was supervised by Turan Beamon, who is African American and served as Defendant's fleet manager. (Dkt. 45 ¶ 8 (citing Dkt. 45-3 at 32:18–20).) Beamon, in turn, was supervised by Doug Heaster, who is white and worked as Defendant's global distribution manager. (Dkt. 45-1 ¶ 3.)

Defendant maintains Environmental, Health, and Safety Cardinal Rules ("Cardinal Rules") that are binding on all employees. (Dkt. 45-2.) Two Cardinal Rules presented in Defendant's corporate policy directive state that "seatbelts must be worn properly at all times," and employees must not "willfully by-pass[] any machine guard" or "fail to follow Lockout-Tagout procedures."[1] (*Id.* at 1.) Defendant's directive dated November 1, 2019 also provides that an "intentional violation of a Cardinal Rule, if substantiated in accordance with the process defined in this policy, will result in disciplinary action." (*Id.*) Between March 2017 and June 2021, Defendant has terminated fifteen employees for violations of the Cardinal Rules: five Hispanic employees, two African American employees, one Middle Eastern employee, and seven Caucasian employees. (Dkt. 45 ¶ 18 (citing Dkt. 45-1 ¶ 9); Dkt. 51 at 7.)

---

[1] Per the definitions provided in Defendant's policy directive, "machine guards" include interlocks, light curtains, and physical/barrier guards. (Dkt. 45-2 at 1.) "Lockout-Tagout" refers to "specific practices and procedures to safeguard associates from the unexpected energization or startup of machinery or equipment, or the release of hazardous energy during service or maintenance activities." (*Id.*)

2

On December 20, 2019, Plaintiff spoke over the telephone with dispatcher Requita Ramson, who is African American. (Dkt. 45-5.) After that conversation, Ramson notified Defendant's Human Resources department that Plaintiff spoke to her with an "aggressive" tone and yelled at her. (*Id.*) She also stated that Plaintiff used the "f-word" and that she no longer felt comfortable working with him. (*Id.*)

Eighteen days later, on January 6, 2020, while he was delivering a load for Defendant, Plaintiff was stopped by an Iowa Department of Transportation officer who conducted an inspection of Plaintiff's vehicle. (Dkt. 45-6.) The officer issued Plaintiff an inspection report and noted two violations, including failure to use a safety belt. (*Id.*) Later that day, after returning to Defendant's Bolingbrook facility, Plaintiff placed a copy of the officer's inspection report on Beamon's desk. (Dkt. 45-3 at 44:19–22.)

On January 8, 2020, Plaintiff emailed Beamon and Hester. (Dkt. 8.) Plaintiff's email summarized his previous conversation with Ramson and gave his side of the story. (*Id.*) According to Plaintiff, Ramson had said, "Yes sir, I can do that for you, sir, anything else I can do for you, sir?" (*Id.*) Plaintiff complained that Ramson had spoken to him with a "totally unprofessional, sarcastic, and inappropriate" tone. (*Id.*) In his deposition, Plaintiff interpreted Ramson's use of the word "sir" as related to race, but he did not mention race in his email to management. (Dkt. 45-3 at 126:12–13.)

Plaintiff represents that, on January 9, 2020, he had another conversation with Beamon. (Dkt. 29 ¶ 10; Dkt. 45-3 at 114:6–115:9) This alleged conversation took place in Beamon's office. (*Id.* at 113:8.) Plaintiff and Beamon discussed race in relation to

3

the first incident between Plaintiff and Ramson. (Dkt. 45-3 at 114:6–115:9.) According to Plaintiff, he told Beamon that he did not know "how to call people of color, how to refer to them." (*Id.*) Plaintiff continued, "How do you refer to an African American? How do you refer to a person of color? Excuse my ignorance. Are they black? Are they the N-word? I don't know." (*Id.*)

According to Plaintiff, Beamon then "became defensive . . . [,] irritated . . . [,] clenched his fist . . . [,] and veins in his neck were bulging out." Plaintiff contends that, as he walked away, Beamon called him a "white piece of s--t." (*Id.* at 117:17–118:6.) No witnesses were present. (*Id.* at 113:13–14.) Beamon denies using this derogatory language toward Plaintiff. (Dkt. 45-7 ¶ 10.) Plaintiff never reported the incident to Human Resources. (Dkt. 45-3 at 119:5–13.)

According to Defendant, on January 8, 2020, Beamon discussed Plaintiff's behavior with a group of Defendant's managers and supervisors, who were all white. (Dkt. 45-1 ¶ 6.) The group unanimously recommended terminating Plaintiff's employment for failing to wear a seatbelt in violation of the Cardinal Rules. (*Id.*) Beamon and Heaster followed the recommendation and terminated Plaintiff's employment. (*Id.*)

Plaintiff, however, maintains that he was terminated because of his race. (Dkt. 29 ¶¶ 12–13.) Plaintiff argues that Beamon's derogatory comment amounts to direct evidence of discrimination. (Dkt. 52 at 3.) Plaintiff also contends that Defendant's stated reason for terminated him—failing to wear a seatbelt—was pretextual. (Dkt. 29 ¶ 16.) To support his allegation of pretext, Plaintiff maintains

that Defendant failed to follow its own procedures for terminating employees for Cardinal Rules violations. Plaintiff also argues that he did not violate the Cardinal Rules with "intent." (Dkt. 52 at 4–6.) Moreover, Plaintiff alleges that he was treated less favorably than similarly situated nonwhite employees. Specifically, Plaintiff contends that, although Defendant disciplined him with termination for his rule violation, "drivers of color" had received citations and otherwise failed to perform professionally, but Defendant did not discipline them. (Dkt. 52 at 7.)

## II.  LEGAL STANDARD

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). All

facts, and any inferences to be drawn from them, are viewed in the light most favorable to Plaintiff as the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III. DISCUSSION

### A. Plaintiff's Employment Discrimination Claim (Count I)

#### 1. Relevant Seventh Circuit Precedent

Under Title VII of the Civil Rights Act of 1964, it is unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Before its decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit used two distinct methods to prove discrimination under Title VII. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (overruled in part). A plaintiff could prove employment discrimination by using either the "direct method" or "indirect method." *Id*. Under the direct method of proof, a plaintiff would show, by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose. *Id*. Under the indirect method of proof, a plaintiff would proceed under a burden shifting framework (the venerable *McDonnell Douglas* framework). *Id*.

But in 2016, the Seventh Circuit acknowledged that it had become tangled in a "rat's nest of surplus tests" in employment discrimination cases, "struggling to

pigeonhole evidence into the direct or indirect method with various overlaying requirements of 'convincing mosaics' and circumstantial or direct evidence." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz*, 834 F.3d at 764–66). *Johnson* explained that the Seventh Circuit in *Ortiz* had "clarified the singular question that matters in a discrimination case: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.' " *Id*. (quoting *Ortiz*, 834 F.3d at 765). Accordingly, evidence must be considered "as a whole," rather than "asking whether any particular piece of evidence proves the case by itself."[2] *Id*.

Plaintiff does not purport to rely upon the *McDonnell Douglas* burden shifting framework of the indirect method; Plaintiff instead proceeds by "direct evidence of discrimination." (Dkt. 54 at 1–2; Dkt. 52 at 3). Defendant contends that Plaintiff has not satisfied the indirect method nor has otherwise shown evidence of discrimination when viewing the evidence as a whole. (Dkt. 44 at 5–8.) It is evident thus that the parties talk past each other when addressing the sufficiency of Plaintiff's evidence. But this lack of cohesion ultimately does not matter because, under *Ortiz* and its

---

[2] Even as the Seventh Circuit eliminated distinct methods of proving discrimination, it specifically ensured that the "well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson,* 892 F.3d at 894 (citing *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)). But *Johnson* stressed that there is "no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Id*.

progeny, "all evidence belongs in a single pile and must be evaluated as a whole." *Lewis v. Wilkie*, 909 F.3d 858, 871 (7th Cir. 2018) (quoting *Ortiz*, 834 F.3d at 766). Accordingly, the Court first analyzes the evidence under each framework only to organize the relevant evidence, using each method's case law as guidance. Next, in accordance with *Ortiz*, the Court assesses the evidence "as whole" to determine whether the evidence would permit "a reasonable factfinder to conclude" that Plaintiff's race "caused" the discharge. *Id.* at 866 (citations omitted).

### 2. Plaintiff fails to show race discrimination under the indirect method.

If a plaintiff utilizes the *McDonnell Douglas* framework to establish a *prima facie* case of reverse discrimination, the plaintiff must show the following elements to survive a motion for summary judgment:

> (1)    "background circumstances" exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something "fishy" about the facts at hand; [3]
> (2)    he was meeting his employer's legitimate performance expectations;
> (3)    he suffered an adverse employment action; and
> (4)    he was treated less favorably than similarly situated individuals who are not members of his protected class.

*Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (citations omitted); *see also Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022).

---

[3] Under the traditional *McDonnell Douglas* test, a plaintiff must demonstrate that he is a member of a protected class. *Mills v. Health Care Servs. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999). In reverse discrimination cases, however, the test is altered, requiring that the plaintiff demonstrate "background circumstances" that the employer has either reason or inclination to discriminate. *Id.*

Even though Plaintiff does not expressly argue under the indirect method of proof, the evidence Plaintiff presents nevertheless fails to show race discrimination under this method. First, Plaintiff has not offered any evidence showing background circumstances of discrimination. To establish background circumstances in a reverse discrimination case, a plaintiff must show that his employer has reason to discriminate against whites. *Id.* Evidence might include pressure from affirmative action plans, customers, public opinion, a judicial decree, or corporate superiors imbued with a belief in diversity. *Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 574 (7th Cir. 2021); *see also Runkel v. City of Springfield*, 51 F.4th 736, 743 (7th Cir. 2022) (finding background circumstances of discrimination at municipal employment where mayor discussed in interview how hiring a minority employee was example of how his administration was "moving toward reflecting the city's demographics"). Plaintiff has not produced any evidence to suggest that Defendant was under pressure to discriminate against whites.

Evidence of background circumstances of discrimination could also include evidence that "members of one race were fired and then replaced by members of another race." *Bless*, 9 F.4th at 574. But Plaintiff stated in his deposition that he is unaware of the race of the employee whom Defendant hired to replace him, and Plaintiff has not produced any other evidence that Defendant replaced him with a nonwhite employee. (Dkt. 45-3 at 175–76.) On the contrary, Heaster declared that Defendant hired another white employee, who also reported to Beamon, shortly after

Plaintiff's termination.[4] (Dkt. 45-1 ¶ 10.) Defendant also contends that it terminated 15 employees for Cardinal Rule violations since March 2017, eight of whom were nonwhite. (Dkt. 45-1 ¶ 12.)

Plaintiff similarly has not produced any evidence that he was meeting his employer's legitimate expectations. On the contrary, Plaintiff was cited by a law enforcement officer for not wearing a seatbelt, which shows he violated one of Defendant's Cardinal Rules. (Dkt. 45-7.) In addition, although not cited by Defendant as reasons for his termination, Plaintiff engaged in other unprofessional conduct. Plaintiff's co-worker, Ramson, filed a timely complaint with Human Resources against Plaintiff for speaking to her with an "aggressive tone" and yelling at her. (Dkt. 45-5.) In his conversation with Beamon, Plaintiff referred to Ramson as speaking with a "slave" dialect. (Dkt. 45-3 at 115–116.) Plaintiff asked Beamon whether he could properly refer to African Americans with the "N word." (*Id.*) Such language could also be grounds for finding that Plaintiff did not meet his employer's legitimate expectations.

Plaintiff also has not offered any evidence that he was treated less favorably than similarly situated, nonwhite individuals. "Similarly situated" means "directly comparable in all material respects." *Johnson*, 892 F.3d at 898. Proposed comparators need not be identical in every conceivable way, however, and courts must conduct a "common sense examination." *Id.* Courts instead simply must ask whether there are

---

[4] A gross disparity in qualifications might also satisfy the background circumstances element. *Id.* But Plaintiff has not produced any such evidence.

"enough common features between the individuals to allow a meaningful comparison." *Id.* (citing *Coleman v. Donahoe*, 667 F.3d 841, 841 (7th Cir. 2012)).

To support his claim of disparate treatment, Plaintiff alleges that "drivers of color" working for Defendant violated Defendant's rules but were not disciplined. (Dkt. 52 at 7.) Defendant stated in his deposition that these employees allegedly received "citations, traffic citations, [were] involved in traffic accidents, did not show up for work, no call/no show, [and were] towed out of mud." (*Id.* (citing Dkt. 45-3 at 86:18–21).) But Plaintiff has offered no evidence, beyond his own speculative testimony, that these violations occurred. As the Seventh Circuit has held, a plaintiff may not rely on mere speculation to demonstrate that an alleged comparator was treated less favorably. *See Johnson*, 892 F.3d at 898 (plaintiff "did not submit affidavits . . . [,] records of assignments, pay, or any other scintilla of evidence of how similarly situated white employees were treated").

Even if Plaintiff presented evidence of disparate treatment through these allegations that his colleague comparators committed violations of some of Defendant's rules, Plaintiff does not allege any violations of the Cardinal Rules. (Dkt. 52 at 7.) Defendant's two Cardinal Rules, as promulgated in the corporate policy directive dated November 1, 2019, are as follows:

- Seatbelts must be worn properly at all times when operating an industrial vehicle or any other vehicle (including both company and personal vehicles) while conducting business on behalf of [Defendant] as defined in the Vehicle Safety Standard (exception – vehicles not designed to have a seatbelt by the manufacturer).
- Willfully by-passing any machine guard and/or failing to follow Lockout Tagout procedures is prohibited.

11

(Dkt. 45-2 at 1.) Defendant views seatbelt infractions as a "particularly dangerous" infraction. (Dkt. 45-1 ¶ 4; Dkt. 45-2.) By contrast, Plaintiff's allegations that his alleged comparators received citations, did not appear for work, and were involved in vehicular accidents are perhaps evidence of a certain level of misbehavior, but by the text of Defendant's policy directive, such misconduct does not violate Defendant's Cardinal Rules. Plaintiff's alleged comparators are thus not similarly situated in a material way. Plaintiff has not produced evidence to suggest that Defendant treated him less favorably than similarly situated nonwhites; on the contrary, Plaintiff's misbehavior constituting a violation of the Cardinal Rules was more severe and treated accordingly. Taken together, Plaintiff fails to produce sufficient evidence under the indirect method to show that he was terminated because of his race.

### 3. Plaintiff fails to offer any evidence of pretext.

Plaintiff also alleges that his termination for failing to wear a seatbelt was pretext for race discrimination. (Dkt. 29 ¶ 13.) Plaintiff argues that the Cardinal Rules state that an "*intentional* violation of a Cardinal Rule, if substantiated in accordance with the *process* defined in this policy, will result in disciplinary action." (Dkt. 52 at 4–5 (citing Dkt. 45-2) (emphasis added).) Plaintiff contends that Defendant did not follow proper "procedures" when terminating an employee for a Cardinal Rule violation. (Dkt. 54 at 1–2.) Plaintiff also argues that he did not violate the Cardinal Rules with "intent." (Dkt. 52 at 4–5). Plaintiff's termination for a Cardinal Rule violation, Plaintiff concludes, was therefore pretextual.

A theory of pretext "requires more than showing that the decision was mistaken, ill-considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella*, 817 F.3d at 513. In other words, pretext is a "lie," a "phony reason for the employment action." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017).

If Defendant did not follow its own procedures when terminating Plaintiff for a Cardinal Rule violation, this might support an inference of pretext. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (explaining an employer's failure to follow its own internal employment procedures can be evidence of pretext). But Plaintiff has not shown that Defendant deviated from its procedures. Plaintiff relies merely on his speculative, conclusory testimony that Defendant did not follow the Cardinal Rule violations procedures. (Dkt. 45-3 at 94:3–9.) Plaintiff has not demonstrated that he has personal knowledge of the steps Defendant took before his termination. Nor did Plaintiff produce any affidavits or witness testimony to show a deviation from procedure; Plaintiff did not even specify which procedures that Defendant failed to follow. Accordingly, Plaintiff's speculation that Defendant failed to follow the termination procedures is insufficient to create an inference of pretext.

Plaintiff's suggestion that he did not violate the seatbelt rule with intent also fails to establish pretext. Plaintiff appears to argue that the intent element of a Cardinal Rule violation was not satisfied because he claims he was looking out the window of the truck at time of his citation. (Dkt. 52 at 5.) But, as noted above, the central question of the pretext inquiry is whether the employer "honestly believes"

the stated reason for termination. *Formella*, 817 F.3d at 513. Defendant reasonably relied on the Iowa Department of Transportation officer's citation against Plaintiff— which Plaintiff himself signed—to conclude that he violated a Cardinal Rule. (Dkt. 45-6.) Even if Plaintiff had been looking out the window at the time of his citation, as he contends, and therefore not violating any driving regulation or Cardinal Rule, this representation is insufficient to demonstrate that Defendant's stated reason for terminating Plaintiff was a "lie" or not "honestly believed." *Formella*, 817 F.3d at 513. In other words, even if Plaintiff had an excuse for not wearing his seatbelt, Defendant still could honestly believe that Plaintiff intentionally violated its Cardinal Rules.

To further counter Plaintiff's allegation of pretext, Defendant points to what the Seventh Circuit has referred to as the "same actor inference" or "common actor inference." (Dkt. 44 at 7); *McKinney v. Office of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017). Plaintiff testified that Beamon—who allegedly held discriminatory animus towards Plaintiff—also made the initial decision to hire Plaintiff the year before. (Dkt. 45-3 at 50:6–8.) As the Seventh Circuit has recognized, if the person who terminated an employee also hired the employee, factfinders may infer that the person does not harbor discriminatory animus against the terminated employee. *McKinney*, 866 F.3d at 814 (noting that the same actor inference is "something for the trier of fact to consider").

In sum, even if Plaintiff did not violate the Cardinal Rules with intent, and even if Defendant failed to follow its Cardinal Rules procedures before terminating

him, no reasonable fact finder could conclude that Defendant's stated reason for terminating Plaintiff was pretextual.

### 4. Plaintiff's testimony that Beamon called him a "white piece of s--t" is not dispositive.

Plaintiff maintains that Beamon's "white piece of s--t" comment amounts to "direct evidence" of Defendant's discrimination. (Dkt. 52 at 3.) In *Darchak v. City of Chicago Board of Education,* which is factually analogous to the present case, the Seventh Circuit held that an employer's racially charged statement, followed by an adverse employment action soon after the statement, was sufficient to satisfy the direct method. 580 F.3d 622, 632 (7th Cir. 2009). In that case, the plaintiff was a Polish-speaking teacher. *Id.* at 626. According to the plaintiff, she had told the school principal that the Hispanic students were given better resources than the Polish students. *Id.* at 627. But the principal allegedly responded that Hispanic students are "better than Polish and deserve more than Polish people . . . . If you don't want to do whatever I tell you to do, you can leave my school." Although the principal later denied making these statements, *id.*, the plaintiff's contract was not renewed four months after that conversation. *Id.* As the Seventh Circuit held, the plaintiff's testimony recounting the principal's statement was sufficient evidence to satisfy the direct method of proof of employment discrimination. *Id.* at 631. As *Darchak* explained, the principal's alleged statements showed clear "discriminatory animus," and it was necessary for a jury decide whether the principal's alleged racial animus caused the termination decision. *Id.*

As did the plaintiff in *Darchak*, Plaintiff presents evidence by way of sworn deposition testimony that he was terminated shortly after Beamon, an African American, used derogatory language toward Plaintiff, who is white. (Dkt. 52 at 3.) Plaintiff's testimony that Beamon used derogatory language in temporal proximity to his termination thus presents "direct" evidence of discrimination. But the Seventh Circuit in *Ortiz* (and its progeny) has cautioned that the presentation of so-called "direct" evidence is not dispositive and that "district courts must stop separating direct from indirect evidence and proceeding as if they were subject to different legal standards." *Ortiz*, 934 F.3d at 765 (citations omitted). Instead, the evidence presented

> must be considered *as a whole*, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the direct evidence does so, or the indirect evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled direct or indirect.

*Id.* (emphasis added). Accordingly, this Court must aggregate the evidence "to find an overall likelihood of discrimination." *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 924 (7th Cir. 2020) (quoting *Ortiz*, 934 F.3d at 763). This means that the Court must take the additional step of considering Beamon's alleged comment, in conjunction with all relevant evidence, to assess whether the evidence taken as a whole establishes a likelihood of discrimination.

### 5. Reviewing the evidence as a whole, no reasonable factfinder could conclude that Plaintiff was terminated because of his race.

Plaintiff's testimony that Beamon called him a "white piece of s--t" shortly before his termination, when viewed "as a whole" alongside the other evidence, fails

to show that Plaintiff was terminated because of his race. Beamon's alleged comment must be analyzed within the context in which it was made—the conversation between Plaintiff and Beamon on January 9, 2020 in Beamon's office. (Dkt. 29 ¶ 10; Dkt. 45-3 at 113:8, 114:6–115:9) Plaintiff represents that one facet of their conversation involved telling Beamon that he did not know "how to call people of color, how to refer to them." (Dkt. 45-3 at 114:6–115:9.) Plaintiff also asked, "How do you refer to an African American? How do you refer to a person of color? Excuse my ignorance. Are they black? Are they the N-word? I don't know." (*Id.*) According to Plaintiff, Beamon then "became defensive . . . [,] irritated . . . [,] clenched his fist . . . [,] and veins in his neck were bulging out." Plaintiff contends that, as he walked away, Beamon called him a "white piece of s--t." (*Id.* at 117:17–118:6.) Beamon denies using this derogatory language toward Plaintiff. (Dkt. 45-7 ¶ 10.) No witnesses were present for this alleged conversation between Plaintiff and Beamon (*id.* at 113:13–14), and Plaintiff never reported the incident to Human Resources. (Dkt. 45-3 at 119:5–13.)

Considering Beamon's alleged comment in this context, Beamon's comment does not point to a pattern of racial animus towards Plaintiff; rather, it constitutes an isolated incident where Beamon, an African American, was angry at Plaintiff for his comments about not knowing how to refer to African Americans. Even more strongly, Beamon was angry because, as Plaintiff himself stated in his deposition, Plaintiff believed that calling African Americans the N-word could constitute sufficient decorum in the workplace. Despite Plaintiff's argument to the contrary (Dkt. 52 at 4), evidence of this comment—accounting for the proper context in which

the comment was made—is insufficient to defeat summary judgment because the comment must be considered with all other evidence "as a whole." *Ortiz*, 934 F.3d at 765.

Plaintiff has not pointed to any background circumstances to suggest that Defendant discriminates against whites. Plaintiff did not produce evidence that Defendant was under pressure to diversify its workforce or that Defendant was imbued with a belief in diversity. In fact, Beamon, whom Plaintiff asserts allegedly harbored racial animus against whites, initially hired Plaintiff a year before his termination. And five out of the six people who recommended Plaintiff's termination were white. Plaintiff has also failed to offer any evidence that he was treated less favorably than similarly situated nonwhite employees. On the contrary, Defendant swore that it replaced Plaintiff with a white truck driver. A majority of the fifteen employees that Defendant terminated for Cardinal Rule violations since March 2017 were nonwhite.

Defendant believed that Plaintiff failed to meet its legitimate employment expectations when Plaintiff was cited by a transportation officer for failing to wear a seatbelt, in violation of Defendant's Cardinal Rules. Defendant's conduct towards Ramson and Beamon suggests additional areas where Plaintiff was not meeting Defendant's legitimate employment expectations.

As such, even when viewing all facts in the light most favorable to Plaintiff, Plaintiff has not produced sufficient evidence to survive summary judgment. Even if Beamon called Plaintiff a "white piece of s--t," once the alleged comment is placed in

its proper context and considered "as a whole" with all other evidence presented in this case, no reasonable factfinder could conclude that Plaintiff was terminated because of his race.

### B.    Plaintiff's Hostile Work Environment Claim (Count II)

Title VII prohibits the maintenance of a hostile work environment. *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013); 42 U.S.C. § 2000e-2(a)(1). A work environment is hostile under Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1115 (7th Cir. 2022). To prove a hostile work environment claim based on either race or gender, an employee must show (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Id.*

To determine whether the alleged conduct is sufficiently severe or pervasive to be actionable, courts look at the totality of the circumstances, including:

(1)    the frequency of the discriminatory conduct;
(2)    how offensive a reasonable person would deem it to be;
(3)    whether it is physically threatening or humiliating conduct as opposed to verbal abuse;
(4)    whether it unreasonably interferes with an employee's work performance; and
(5)    whether it was directed at the victim.

*Lambert v. Peri Formworks Sys., Inc.,* 723 F.3d 863, 868 (7th Cir. 2013). Courts also assume employees are generally mature individuals with the thick skin that comes

from living in the modern world. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018). As a result, employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are not uncommon in the workplace. *Id.*

Plaintiff does not address the hostile work environment claim in his response to Defendant's motion for summary judgment. (Dkt. 60.) Courts have held that the "failure to respond to an opposing party's argument implies concession." *Midwest Generation EME, LLC v. Continuum Chem. Corp.*, 768 F. Supp. 2d 939, 950 (N.D. Ill. 2010) (citing *Milam v. Dominick's Finer Foods, Inc.*, 567 F.3d 830, 832 (7th Cir. 2009) (Easterbrook, C.J., in chambers) ("My earlier opinion explained why secrecy appears to be unwarranted, and I take plaintiffs' silence in their response as acknowledgment"); *see also Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude" a concession)). But even when considering the merits of Plaintiff's hostile work environment claim and drawing all reasonable inferences in Plaintiff's favor as the nonmoving party, Defendant is entitled to summary judgment.

Plaintiff's complaint suggests two incidents that could be the basis of a hostile work environment claim. (Dkt. 29 at 7.) First, Plaintiff alleges that Ramson spoke to him with an "aggressive" tone. (*Id.*) Second, Plaintiff alleges Beamon called him a "white piece of s--t." (*Id.*) But even if true, these incidents do not support a hostile work environment claim.

20

Plaintiff has produced no evidence, beyond his own speculative testimony, that Ramson's "aggressive" tone was related to Plaintiff's race. Plaintiff does not allege, for example, that Ramson used any racial slurs or otherwise referenced Plaintiff's race during their conversation. Instead, Plaintiff merely speculates that the "aggressive" tone must have related to Plaintiff's race. As such, Ramson's alleged "aggressive" tone cannot form of the basis of a hostile work environment claim.

As for Beamon allegedly calling Plaintiff a "white piece of s—t," this statement may be racial harassment on its face but nevertheless remains a single, isolated incident. As such, this alleged harassment against Plaintiff was not pervasive. In addition, Plaintiff has not produced sufficient evidence that Beamon's statement was severe according to the factors outlined in *Lambert*'s totality test. Plaintiff does not allege, for example, that Beamon physically threatened him. Nor does Plaintiff allege Beamon's statement was made in the presence of others as to humiliate Plaintiff. Plaintiff also did not produce evidence that the comment interfered with his work performance. As such, no reasonable factfinder could conclude Beamon's single statement was sufficiently severe or pervasive to constitute a hostile work environment.

Because neither statement amounts to a hostile work environment, Defendant is entitled to summary judgment on Count II of Plaintiff's complaint.

## IV. CONCLUSION

Defendant's motion for summary judgment (Dkt. 43) is granted. Civil case terminated.

SO ORDERED in No. 21-cv-00059.

Date: March 30, 2024

_____

JOHN F. KNESS
United States District Judge